v. BAYER HEALTHCARE v. WATSON PHARMA v. BAYER HEALTHCARE v. WATSON All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning, ladies and gentlemen. Good morning. We have, please, we have four cases on the calendar this morning. Three patent cases and a government employee case. The latter is being submitted on the briefs and will not be argued. First case is BAYER HEALTHCARE. Maybe in the United States it's BAYER v. WATSON et al. 2012-1397. After we hear this case, the panel will retire briefly and come back in a somewhat modified form. It will be just a brief recess. So let us proceed. Mr. Hines. Good morning, your honors. May it please the court. My name is Joe Hines and I'm representing the appellant, Sandoz, Inc. I'm also arguing on behalf of Watson and Lupin, the other appellants in this consolidated appeal. And I'd like to reserve five minutes of my time for rebuttal. Before addressing the merits of the appeal, I'd like to acknowledge the letter of the court dated December 20th, 2012, asking the party's views on whether these proceedings should be suspended pending the outcome in the Robert Bosch case. And as set forth in our letter to the court dated January 3rd, it's our position that the outcome of the Robert Bosch case will not impact jurisdiction in this case. And that's because that case involves a different statutory provision. And in particular, in the Robert Bosch case, that deals with jurisdiction under 1292 C.2. And in particular, whether untried issues of damages and willfulness constitute an accounting. But do we have jurisdiction anyway? The district court issued a partial final judgment and it granted a stay of termination of remedies, including setting the effective date when, if we affirmed, the clients could go on the market. Why is this case lacking a final judgment? Why isn't this case lacking finality? It's not lacking finality because with respect to the Watson and Sandoz case, the appeal comes from a final judgment under Rule 54B on its invalidity counterclaims. So it's expressly recognized that all of the remedies have been severed and left in the district court. But as to the invalidity counterclaims, there is a final judgment. And with respect to Lupin, they're also... Is the totality of the claim determined? The court retained jurisdiction. Right, it retained jurisdiction over the infringement claim and in particular, the remedies flowing from a finding of infringement. So I think that that is a separate claim and that is what is left back in the district court. And what we have here is the final determination under Rule 54B as to the invalidity counterclaims. And I would submit, Your Honor, that there's really no overlap between those claims. And that's why we do have finality with respect to the judgment from the district court in jurisdiction of this appeal. Okay, I'm going to then go ahead and proceed to the merits of the case then. The district court granted Behr's motion for summary judgment that the patent is not obvious. And in doing so, it committed a number of errors requiring reversal as outlined in our briefing. But I just want to deal with three. The first error is that the district court found that there was no problem of a missed-till pregnancy and therefore, no motivation to combine the prior art to lead to the claimed product. The second error is that the district court misconstrued the scope and content of the prior art when it dismissed express teaching in the prior art for a 23-5 and a 24-4 dosing regimen. And in fact, found that the prior art taught away from that teaching. And third, the district court applied the wrong standard on summary judgment. The district court consistently failed to draw justifiable inferences in appellant's favor as it was required to do when it granted Behr's motion for summary judgment. Can I – since time is limited, I know you'd like to go in your order. But let me just jump to something that's of concern to me. I mean, the district court judge did a very, very thorough job. But it seems to me one of the dividing lines between you and what your friend on the other side says is the way in which he construed the EP-607 and the AU-94. And he seems to kind of have taken those two references off the table because they dealt with HRT and oral contraceptives. Your case, it seems to me, if you've got a strong case for obviousness, it really relies on the relevance of those two references. So could you just explain to me why you think he was incorrect? There were numerous findings in which he says, for example, in one of them there was no reason for a person skilled in the art to move away from the prior arts teachings as a whole because the NOT-607 intended to provide HRT and oral contraception. So you know what I'm getting at. Sure, absolutely. And there are a number of reasons why the judge erred in those findings. First of all, I'd like to start from the fact that the claim at issue here is a product claim. It's not a method of use claim. It's just a product claim with 23 or 24 active pills and five or four placebo pills. It's not limited to any specific patient population. So with respect to those two references, Your Honor, the district court, I think, improperly focused on this EP-607 reference as being our base reference that we're relying upon for finding the Drosperinone and EE dosages. Well, that's really not our case at all. Our case is based primarily on this AU-094 reference. That reference does discuss treating premenopausal women for contraception and HRT, but it also expressly states that it's applicable for younger women as well. It deals with younger women, and it specifically identifies dosages of Drosperinone and EE that fall right in line with what is being claimed in the patent. So the EP-607 is not being relied upon for dosages. It doesn't even identify Drosperinone. We're relying upon EP-607 for the teaching of the 23-5 and 24-4 dosing regimen, and in fact, the AU-094 reference specifically incorporates EP-607 by reference in its entirety into that document. So if you take the combination of AU-094 and EP-607, you have the claimed dosages of Drosperinone, the claimed dosages of EE, and you have… Yeah, but my point is that the judge seemed to discount the relevance of that because at least the EP-607 was directed towards premenopausal women, not just for oral contraception, but for HRT. So I wanted you to address why he's wrong about that. Do you agree with me that he kind of discounted the relevance of those references because of that? He absolutely did. And why is that wrong? Well, he's wrong because, first of all, there's nothing in the claim to limit the product to use only for a woman who would not also need HRT. So he's just completely wrong on that. He's also overlooked the fact that it does relate to conception, and he's also focusing on EP-607 as the primary… Contraception. Excuse me, contraception. I'm sorry. As the primary reference, whereas it's actually AU-094, which is the primary reference that discusses Drosperinone and EE, and 607 is only being used for the 20, 23-5, and 24-4. Now, he's also wrong on EP-607 because he's focused on the fact that, well, it uses all of these lower doses. It discloses using lower doses of these progestins. Okay? Well, that's not relevant. We're not relying upon EP-607 for dosages of either the Drosperinone or the athenalessadryl. That's all disclosed in the AU-094 patent. So I think the court's made a number of mistakes there. Can you – I know I interrupted you, but I know your first point was going to be on the mispill issue. So do you want to turn back to that? Yes. Fundamental to the district court's finding of no obviousness was that there was no problem to be solved. There was no recognition in the prior art that there was a risk of mispill conception, and it was just flat wrong on that. We submitted substantial evidence that there was a recognition of a mispill problem. For example, in the Malloy references, and this is in the Joint Appendix at page 1961, it says, to reduce the risk of mispill conception, a 28-day pack containing 23 pills and 5 blanks could be substituted for the current 21-day pack. This would permit a withdrawal bleed without the risk of significant follicular development. Now here's what Bayer's expert had to say about this reference in his deposition. Question, and what was the basis of Malloy's suggestion to use a 23-5 regimen? Witness, okay, I'm going to interpret the prior art. And he states, quote, and at cycle day 28, there was clearly follicle activity. So Dr. Malloy is suggesting, well, if we extend the active pill interval to 23 days, maybe we can reduce that follicle activity and maybe, therefore, reduce the potential for pregnancy with a missed pill. I mean, that's the bottom line. That's my takeaway. So if you look at just the Malloy reference, and there are many others that we cite in our brief, we have a very clear recognition of the problem to be solved, and that is the risk of mispill pregnancy. And they also provide the solution. The solution is to reduce that pill-free interval, have less time for follicular development, and use a 23-5 dosing regimen. The Giobat article that we cite also expressly identifies the risk of mispilled pregnancies. The 564 patent, the patent in suit, also itself expressly recognizes that there's a risk of mispilled pregnancies. Now, that is on the joint appendix of page 75 in column 3 at the top. It says, it is estimated that approximately one-third of females take oral contraceptives irregularly within one year of use, and it cites to a prior article. The risk of pregnancy is, therefore, high, especially in the case of intake errors with 20 micrograms of athenoestradiol preparation. There's also evidence in the Burga Declaration, Lupin's expert, where she expressly recognizes the risk of mispilled pregnancy and the solution of a 23-5 dosing regimen to SALTmac. Let me just ask quickly. It seems to me, if you take all your arguments at face value, what you're arguing for ought to be a trial, that there's a question of fact with respect to motivation, with respect to what the prior art teaches, but you and your friend on the other side are both going for summary judgment here, all making the argument that there is no dispute of fact. Well, I think, of course, we have to look at both summary judgment motions under their appropriate standards, and if you look at Bayer's motion for summary judgment, there is a question of fact. There's a question of fact because there's lots of evidence that the district court just didn't consider that we presented. The district court didn't consider that the 564 patent identified the problem to be solved. The district court did not consider the evidence of Dr. Burga, Lupin's expert, on this issue of whether there was a mispilled problem. And the district court did not consider a whole separate category of evidence. But can you really have it both ways? Can you say there's an issue of disputed fact with respect to their getting summary judgment, but no issue of disputed fact with respect to your getting summary judgment? Here's how I think we can, Your Honor, and that is that even if you're looking at our motion for summary judgment and you construe the evidence in their favor, what do they have? They have their expert report from Dr. Sanfilippo. But on the other side of that, they've got Dr. Sanfilippo's deposition testimony where he essentially agrees with all of the primary interpretations of the prior art, that there was a mispilled, what the prior art teaches. So that doesn't create an issue of fact. Also, you have Dr. Sanfilippo on the one hand. You also have the patent, the patent which recognizes the very problem to be solved, and that's in the prior art. That was a fundamental aspect of the district court's decision on non-obviousness, that there was no risk of mispilled pregnancy. Well, it's right there. It's right there in the patent. So that's why you could say, and I think the correct way to look at it is there really isn't a dispute of fact if you're looking at it from our perspective. But from Bayer's perspective, the judge just didn't consider an enormous amount of evidence that we had presented. Mr. Hines, you've used most of your rebuttal time. Would you like to save the rest? Yes, thank you. Mr. Mortara. May it please the court. The district court's grant of summary judgment in Bayer's favor should be affirmed for two reasons. First, as of the priority date of December 1993, the prior art as a whole unambiguously taught away from Bayer's claimed invention. And second, the generic defendants have virtually defaulted on rebutting Bayer's significant evidence of secondary considerations of non-obviousness. Do we have jurisdiction here and or should we hold this for Bosch? The answer to your second question is yes, Your Honor. This case should be held for Bosch. The answer to your first question is Bayer has no position on the proper outcome of Robert Bosch. However, if Robert Bosch disturbs the law as it is now and holds that the situation of Robert Bosch is not final but foreign and counting, the necessary implication is that the Rule 54B certifications for Watson and Sandoz in this case are improper, and therefore this court would not have jurisdiction over the Watson and Sandoz matters. But the 54B deals with claims, with other claims. In Bosch, we're talking about a singular claim and whether you could bifurcate that and do the merits and then the damages, right? Absolutely correct. So isn't this case different? I mean this is in the 54B box where you've got multiple claims and the judge can set aside certain of those claims and let one go up. Absolutely, Your Honor. This case is different, but this court will have to grapple with 54B certifications like this immediately following Robert Bosch because this court's precedent, W.L. Gore, says that when determining whether a 54B certification is proper, one must determine whether there's overlap. Here there's clearly overlap with what if Robert Bosch comes out and disturbs settled law is a non-final claim because Bayer's affirmative claim for infringement and willfulness and damages overlaps with the invalidity counterclaim because particularly for willfulness, under this court's willfulness precedence, the court will have to reevaluate the strength of the validity defenses in connection with Bayer's affirmative claim. Therefore, the 54B certification under W.L. Gore and this court's precedence regarding 54B is improper if Bayer's affirmative claim right now is not final but for an accountant. In fact, district courts have explicitly connected 1292C with the standard for 54B in making 54B certifications. That's the Johnson and Johnson case. What you're saying is kind of scary, isn't it, because you're assuming necessarily that 54B – what you started by saying is after, if we go a certain way on Bosch, after that we're going to have to grapple with the complicated question of the overlap of 54B. Well, it's not a foregone conclusion that we will necessarily grapple with that question in Bosch. So you may be telling us that we're not going to even have to just wait for Bosch to be decided, but we're going to have to wait for some subsequent cases after Bosch to be decided, right? Yes, Your Honor. This may be that subsequent case. Okay. That's exactly the point. This may be the case. And I would just like to point out to the Court that there is an identical 54B, an identical declaratory judgment of invalidity and non-infringement counterclaim in Robert Bosch. It's not before the Court on appeal, but the judge on remand in Robert Bosch could simply 54B certify the counterclaims there, right back in exactly the same situation. And if Congress's intent is not to permit interlocutory appeals of the type in Robert Bosch, then certainly a 54B certification of a pro forma counterclaim should not be permitted to raise on appeal. Mr. Notaro, let me ask you one question. What about the lupin part of the case? I mean, does what you say apply to lupin? I mean, couldn't we go ahead and address the lupin part of the case because it's exactly the same issues on the merits and all? Your Honor, the answer is mostly yes. There is a problem. The body problem isn't in lupin, is it? It's not the same problem of 54B. It's a different problem that if this Court takes a view of final but for an accounting in Robert Bosch that would preclude the remedy Bayer is seeking against lupin of the reset date being even remotely considered in accounting, then the lupin judgment is also not final because Bayer's remedy, the remedy Bayer is seeking of the reset of lupin's approval date has not been decided by the district court. And whether the district court calls it final or not, it's not final. This Court has repeatedly held that outstanding claims for injunctive relief render a district court judgment on infringement and validity not final. And therefore, the lupin judgment today is not final and will not be final until the district court rules on Bayer's motion. Now, as to the merits, all the pieces of this claim were in the prior art. The particular materials, the final estradiol, the gestogen, the idea of a shortened period of placebo, they're all there. Why didn't the district court err in holding the patent valid? Well, what your Honor said is true of most inventions. And yes, each discrete element is present in the prior art. That's true. But what's not present in the prior art is any reason to combine them, in particular to make the combination of a low-dose EE pill, 20 micrograms, which is our invention, with the shortened pill-free interval. In fact, the prior art teaches precisely the opposite. The Gillibaud reference that Mr. Hines mentioned says only shorten the pill-free interval in connection with a high-dose combined oral contraceptive. The Landgren 1991 reference says that shortening the pill-free interval for a low-dose oral contraceptive would result in negligible gain. That is from 1991 at near the time of the claimed invention. Landgren is saying negligible gain for shortening the pill-free interval for a low-dose oral contraceptive. And in the medical profession, where everything is risk-benefit, negligible gain, when you look at Gillibaud who's saying there's health benefits for a full seven-day break and there's health risks for shortening the PFI, when Landgren in 1991 says negligible gain, that's a teaching away. It's always good to use lower doses when you can. And shortening the placebo period lessens the risk of pregnancy. Your Honor, that was absolutely not recognized in 1993, that shortening the placebo period would have a significant or material effect on the risk of pregnancy, so much so that when Bayer went to European regulators to get its product, Yaz, approved, they had a product called Yazminel on the market. Yazminel is very interesting because Yazminel is a 21-day product with exactly the same active tablet as Yaz. Bayer already had that on the market in Europe. And what the European regulators from the UK, Austria, Spain, Italy, all said was, you're proposing a significant safety risk because you have an effective pill on the market and you can't prove that Yaz would be better. We couldn't get Yaz approved in Europe until we demonstrated to the European regulators that Yaz was not only superior to Yazminel, but Yaz was superior to a pre-existing high-dose pill, which is Yazmin. And this is a decade after the invention. No one believed that shortening the pill-free interval for a 20-microgram pill would actually materially impact clinical outcomes of pregnancy except our inventors. What about AU94 combined with EP607? I think, to me, that gets you there. Thank you, Your Honor. That's where I wanted to start, which is EP607. The issue with EP607 is emblematic of the problem with the generics approach to the prior art in this case. Because what the generics have done is take snippets of a prior art reference without looking at it as a whole. The very first paragraph of EP607 says that it requires, quote, a very low dose of a progestogen. And the reason for that is that women who need combination HRT and oral contraception can get by and require a lower dose of a progestogen. And those very low doses are laid out in EP607 for the ingredients listed, every one of which is below the per se mainstream conventional dose of those products. And, therefore, the skilled person working with EP607 and combining it with AU94, which discloses a dose range of 0.5 to 50 milligrams of drosperinone, would arrive at the very low dose of drosperinone that is outside our claim scope. The reason for that is because EP607 is directed at a combination product, and it's teaching that you cannot get away from. Mr. Hines said we're not relying on the dose teaching of EP607. You cannot carve out the dose teaching from EP607, quote, very low dose of a progestogen in the first paragraph. You can't do that. So once a skilled person is working on an oral contraceptive, he needs a reason to shorten the PFI. The reason the EP607 shortens the PFI is that women need hormone replacement therapy every day. There's no reason to shorten the PFI when one is working on an oral contraceptive in the mainstream dose range of 2.5 to 3 milligrams of drosperinone, and particularly the low dose contraceptive where the prior art taught against shortening the PFI. Sorry, that was a fairly long answer, Your Honor. I'd like to briefly address Molloy, which also came up in Mr. Hines' discussion, because Mr. Hines said there was actually a recognition of a missed pill problem and brought up Molloy. But he did not mention what Landgren said in 1991. Keep in mind that Landgren comes after Molloy. And what Landgren says is the risk of pregnancy in accidental noncompliance in low dose oral contraceptive users can be regarded as low even when up to three tablets have been missed. That is the state of the art at the time of the invention. And he also pointed us to the specification in column three, which calls out the missed pregnancy problem. Absolutely, Your Honor. What happened is Professor Spona and his colleagues were the first to recognize that this could actually have a clinical relevance. Whatever the missed pill problem was in 1993, no one thought it mattered to the point that you would redesign an oral contraceptive. Let's go back to Molloy. When you're talking about column three, the conclusory sentence follows a reference to a citation in 1990. Your Honor, exactly. And what Professor Spona, who was a world leader in ovarian ultrasound, recognized, and no one else didn't, is that the increased follicular development with a 20-microgram pill might actually have clinical relevance. Everyone else said it didn't. That's precisely the identification of the problem by the inventors. And all the references that you see in the block site that comes afterwards, they don't say there's a missed pill problem with 20-microgram tablets. What they say is, oh, there's increased follicular development. Only Professor Spona and his colleagues recognized that this could actually be clinically relevant. And even they didn't know how clinically relevant it could be. If you go to column four of the patent, the inventors report the surprising ovarian suppression results, one of the unexpected results in this case. The generics say it's not surprising that giving somebody more pills results in greater ovarian suppression. Well, what's surprising is not the direction, but the magnitude. And what our inventors said is, we think a 20-microgram pill of the invention could actually get to be equal in contraceptive efficacy to a higher-dose 30-microgram pill. What actually happened is, unexpectedly for everyone, the FDA, European regulators, and Bayer, Yaz is a provably more effective oral contraceptive than Yasmin, which is a higher-dose pill. In unexpected result, the generics have no answer for, and far from the generics winning summary judgment, Bayer is entitled to summary judgment of non-obviousness because of the generics' decision to virtually default on answering any of the expert skepticism from regulators or these unexpected results. That's why Bayer is entitled to summary judgment. And for your honor's benefit, you talked about potentially the generics being eligible for summary judgment. That's simply not true. There was different evidence before the court in Nevada for both motions. Bayer chose to rely on evidence of commercial success in opposition to the generics motion. That's never even been considered by the district court, and this court cannot render the generics favor without consideration of Bayer's evidence of commercial success. Bayer relied on an opposition to the generics motion. With your permission, your honor, I'd like to just briefly touch on this issue of claim construction raised in connection with the EP-607 and the Gilabod reference. The district court did not rely on any patient population limitation with respect to the claim in determining that Gilabod taught away because Gilabod shortened the PFI with a high EE dose, taught away irrespective of the women he was saying that that was suitable for. Same with EP-607. The identification of premenopausal women as the target population is simply the reason given in EP-607 for its instruction to the skilled person to select a, quote, very low dose of a progestogen. And you cannot, as Mr. Hines tried to do, say we're not relying on EP-607 for the teaching of a very low dose of a progestogen because this court has rejected going all the way back to the CCPA in the 60s, the idea that you can select teachings you like from the prior art and discard teachings you don't. It is a teaching of EP-607 to select a very low dose of a progestogen. Your honor, just a few more points on secondary considerations. I mentioned unexpected results. For ovarian suppression, their response is direction, not magnitude. They've just ignored that we've always said it's magnitude. For actual clinical results, there's no response at all by the generics to the INAS data showing Yaz is superior to Yasmin, surprising to U.S. and European regulators. That's skepticism of experts as well. Also, the generics chose in their briefing here not to respond at all to the evidence that physicians were skeptical of the claimed invention, the regimen. On page 61 of our brief, the generics have just elected not to respond at all. Significant evidence that physicians thought the regimen would provide no benefits and patients would not accept it. Thank you. Thank you, Mr. Muattara. Mr. Hines has some rebuttal time left. Thank you, your honor. We asked you a lot of questions before. If you want to take two minutes, that's fine. Okay, thank you, your honor. Just very quickly. Council stated that there was no reason recognized in the ARC to shorten the pill-free interval. That's just not the case. There's an express suggestion to shorten the pill-free interval and use the 23-5 dosing regimen, both with Malloy and the Goldstock reference, as well as the Landrigan 1984 as identified in our brief. Council also said that there would be no reason to combine or there would be no reason to shorten the pill-free interval with a 20-microgram EE tablet, that the prior ARC didn't teach that. And that's just not the case either, your honor. There is substantial evidence that the district court just didn't consider that there's a reduced margin for error when you use these 20-microgram EE pills. There's less EE there. EE has a role in ovarian suppression. And it was very well recognized that when you get down to those lower levels, you have a reduced margin for error, especially in missed pill situations. And that's a separate and independent basis for motivation to combine the teachings of 23-5 and 24-4 with the other known elements in the prior ARC. Council says that we didn't respond regarding INAZ and the physicians. We absolutely did. And it's set right out there in our brief. Council wants to rely on unexpected results for administering two more active pills for two more days to achieve the same purpose, contraception. It's not unexpected. The prior ARC expressly suggested shorten the pill-free interval, reduce follicular development, and that is going to reduce the risk of missed pill conception. Thank you, Mr. Hines. We'll take the case under revising.